The video is very good, as is the audio, so the argument will go off very smoothly. We have just a couple cases remaining on the docket this morning. Want to give you a word to remind you, though, that we do have time limits, so when the yellow light comes on, you have two minutes left to talk. When the red light comes on, we ask you to conclude your presentation unless you're answering questions from the court. We have not necessarily, well, we have not probably read the entire record, so we very much appreciate record citations when those are appropriate. The first case of the morning is number 2460219, National Religious Broadcasters v. FCC, and the first question I would ask is, is the FCC still appealing or still, yeah, responding here? Well, yeah, if you have something, I mean, you don't have to come up. Just tell us. Yes, Your Honor, we are defending the order here today. We are not defending paragraphs of the order that adopted a gender non-binary reporting option. Those are paragraphs 39 and 40 of the order. The commission hasn't withdrawn those paragraphs, but we are not here today defending those discrete paragraphs. And the other side is aware of that? Your Honor, we haven't communicated with the other side about that. Well, gee whiz. Thank you for letting us know. And if anything else develops in the FCC's intention, I hope you will inform the panel very quickly. So with that, we'll call Ms. Nyman. Good morning, and may it please the Court. My name is Jessica Nyman, and I represent Texas Association of Broadcasters. As Judge Jones just pointed out last week, the Department of Justice, on behalf of Respondent of the United States, abandoned its support for the views expressed in Respondent's brief, quote, to the extent, end quote, Form 395B data collection is not required by statute and is inconsistent with recent executive orders. It is thus unclear now what Respondent's position is, as neither Section 334 nor any other statute authorizes, let alone requires, collection or publication of Form 395B data. In fact, the FCC has chosen not to collect this data in over 20 years and has stated on many occasions that such data is no longer pertinent to assessing compliance with its EEO rules, undermining its claims that such collection is statutorily required. So do we still have adversity? And if so, what's your understanding of what the remaining adversity is? Judge, can you clarify what you mean? Well, I mean, you've kind of said what they're not arguing, and it's your appeal. I could see it could be difficult for you to know, well, do I make my full argument or not, or whatever. I'm just trying to say, I mean, not moot, but it's got to have adversity in the case. And so I just wanted to know succinctly at least what your appreciation of where there's undeniably still adversity. Yes, Your Honor. Well, we noticed that the FCC itself did not sign on to that latest response, the 20HA letter. So it's unclear whether the United States and the FCC, which operates as an independent agency, are taking conflicting positions. The FCC is not bound by the executive orders that were recently released, which also highlights the precarious position that this order places broadcasters in. Who are they supposed to comply with? The regulations of the FCC, the interpretations of the DOJ, the executive orders of the President. They're also supposed to publish this information on the Internet, which is going to draw the ire of the public on either side of this debate. Okay, well, I didn't mean to take time away from your argument, so you can go back to it. Anyway, the Chief has a question. Thank you. Just to clarify that even without paragraphs 39 and 40 that we just learned for the first time today, they're not defending. Even without that, you still protest having to do this at all and it being public, correct? That's correct, Your Honor. This latest about... Can you please talk to us about the Section 334A? Your friend on the other side says in their brief explicitly as a heading that Section 334A expressly authorizes the data collection. I'm having trouble with that. Can you walk me through why it does not expressly authorize and it would seem to be based upon the EEOC portion, the EEO portions of that that were held to be unconstitutional in Lutheran Church and that sort of thing. Can you please walk us through that? Why 334 does not authorize this? Yes, Your Honor. Exactly right. The FCC argues that 334 either requires or at least ratifies its authority to take this action here and it does neither. At most, Section 334, which was adopted in 1992, ratified the FCC's ability to keep in place its rule at the time, which was the EEO program rule requiring broadcasters to recruit in insufficient parity, hire female and minority employees in sufficient parity with the demographics of its community. The court in Lutheran Church held that that violated the Fifth Amendment because it placed unconstitutional pressure on broadcasters to engage in race-conscious hiring. With that being held unconstitutional, it's hard to see how Section 334 can continue to ratify an unconstitutional rule and moreover, Form 395B, which was used in place at that time to enforce 334, was used to enforce the program rule, it's no longer pertinent to an unconstitutional rule. The FCC has claimed that it has new program rules now and that Section 335 or Form 395B is relevant to its discrimination provisions. That's a novel argument that was raised in its response brief here and it conflicts with statements that the FCC has made over the years that the Form 395B is no longer pertinent to enforcing compliance with its EEO regulations. So really, there's nothing in 334. It's not about EEO, it's about demographic data according to FCC's position, isn't it? Exactly, which is why Section 334A, which was put in place to preserve the EEO rules at the time, really has no bearing on resurrection of Form 395B here. The only stated reason the FCC has provided for acquiring publication or collection of Form 395B is so that it can analyze industry trends. Now, the FCC has not explained why that's a critical interest of the FCC. It does not explain why that's required or authorized by Section 334 or any other statute. At most, it's pointed to public interest authority, but all of those provisions are tied to explicit actions such as licensing or the assignment or transfer of broadcast licenses. And if the FCC is saying that it's going to consider the number of female and minority employees that a broadcaster has in making those decisions, then we're back to Lutheran Church in Maryland, D.C., Delaware, where the agency is pressuring broadcasters to achieve a certain result in front of the agency that has life or death power over its operations. So for all these reasons, the lack of statutory authority, the fact that it's, again, infringing on broadcasters' Fifth Amendment rights, and now the exacerbation of the harm of requiring for the first time broad publication on the Internet, explicitly inviting the public to scrutinize the results, to comment on whether the public thinks that the broadcasters have reported their data accurately, calls, you know, requires this Court to vacate. There's no statutory authority. It violates the First and Fifth Amendment. And beyond all that, it's arbitrary and capricious for the reasons explained in our brief. Thank you, Your Honors. Okay. Thank you very much. You have some time for rebuttal. Mr. Kelson. Good morning, and may it please the Court. Jared Kelson on behalf of National Religious Broadcasters and American Family Association. To begin, in response to the question posed by Judge Stewart, we would just add the order is still in effect, and the SEC is here to defend it, so that creates a lot of controversy. In response to Judge Elrod's question about Section 334, we would simply add that it's very clear in that provision also that the authority, or any authority, is not affirmatively granted. At most, it could potentially ratify that authority, and it's specifically tied to the EEO regulations, not general diversity, and those that were in effect in 1992, which have since been held unconstitutional. So there's no way the agency can rely on Section 334A as an authority or justification for a rule, let alone as an affirmative obligation or an affirmative authority. There's a few points of emphasis for the Court. We would point out this Court's decision in Clean Water Action, where this Court clearly stated that agencies are mere creatures of statute, and they must point to explicit congressional authority to justify their decisions. That is lacking here. Congress also knows how to authorize the collection of this type of information. It's done so explicitly for cable companies in Section 554, and it has not done so here. This Court could largely copy its decision from Alliance for Fair Board Recruitment v. SEC and resolve this case. Second, the Supreme Court has repeatedly emphasized that all racial classifications require strict scrutiny. Sex-based classifications are similar and require intermediate scrutiny, and the FCC makes no attempt to satisfy those standards. The FCC instead insists that such heightened scrutiny does not apply because the order will not pressure broadcasters to consider race and sex in employment decisions, but that position cannot be reconciled with the language repeatedly used by the Supreme Court. And the order does pressure broadcasters in multiple ways. Notably, it's important to observe that the FCC invokes its statutory authority to grant and renew licenses, to approve transfers, to authorize other operations, all in the public interest to justify these collections. The FCC is also overtly signaling that it finds this information relevant to its statutory functions and decision-making, which pressures broadcasters to conform to the FCC's advertised diversity objective. That makes this case no different than Lutheran Church and MD-DCDE broadcasters. Finally, the Supreme Court has been similarly clear that compelled disclosures are subject to First Amendment scrutiny. The constitutional violation here becomes overwhelmingly apparent when considering its vast implications, the vast implications of the FCC's arguments. The FCC could compel public—excuse me. The FCC could compel public disclosure about the religion of broadcaster employees. It could compel public disclosure about the political affiliation of broadcaster employees. It could go so far to compel disclosure about who those employees voted for, or at least who their employer thinks that they voted for. And it could do so on the name of diversity, monitoring industry trends, and maybe preparing unsolicited reports for Congress. What would be the basis for those other kinds of disclosures? Well, we clearly think they would violate the First Amendment, but taking the Supreme Court—or taking the FCC's logic at face value, it seems to believe that it can compel disclosure about the race and sex of employees to monitor industry trends, and that that escapes First Amendment scrutiny. If that's all it takes to avoid the First Amendment, then any of these other demographic information is fair game. So you say they could compel dog lovers' disclosures or whatever? I don't see a limiting principle in the FCC's position that would prevent that. Okay. Would this be a much harder case if there was not the public disclosure requirement? I don't know that it would be much harder. It would be a slightly different case. The public disclosure here, I think, serves a number of functions. It shows that the—it speaks to the narrow tailoring of the agency's decision, that if it's trying to monitor industry—it would have to—the agency would need to provide either additional compelling reasons for public disclosure or show that the public disclosure itself is narrowly tailored to its asserted ends. As Commissioner Carr pointed out in his dissent, there's no way to justify the public disclosure here, and so that aspect of the decision exacerbates the First Amendment problem. If there are no further questions, I'll reserve the remaining time. We have other questions. Thank you, sir. You also have an opportunity for rebuttal. Thank you. Okay, Mr. Scherr. The reason I asked about the status is that yesterday we had a case involving the CFPB, and the lawyer appeared and said he had no authority to proceed further. So I think CFPB is supposed to be an independent agency. Of course, Mr. Chopra had been fired by that time, and I don't know whether the interim head had been appointed, so I'm just—yes, you're an independent agency, but what right does the FCC have not to follow an executive order? Your Honor, the agency hasn't made any determination about the effect of the recent executive orders on the portions of the order other than the two paragraphs that I mentioned, adopting the non-binary gender. The agency hasn't taken the position that the executive orders won't impact that order, but again, the agency hasn't made any determination. The Justice Department, in its letter filed, I think, on Friday, said that it was withdrawing to the extent that the executive orders conflicted with the brief, the positions taken in the brief, but the commission's order that I'm defending here today represents the last word of the full commission unless and until a quorum of commissioners withdraws the order or decides otherwise, so that's what I'm here to say. Okay, but DOJ, could DOJ come in and say, on the basis of our DEI order, you can't pursue this? I'm just wondering. I don't know whether they, my understanding from having read the executive orders is that they apply to agencies generally. I'm not prepared to make an argument, certainly, that because of the FCC status as an independent agency, it could ignore the executive orders. The commission just hasn't had an opportunity yet to either withdraw or decide the impact. Well, I was thinking more of the timing of whatever the court would write because it would be a shame to crank out an immediate opinion only to have the FCC suddenly withdraw, but anyway. I understand your concern, Your Honor, and I wish I could speak to the timing of the agency's consideration of the executive orders or future action with regard to this order, but I'm not in a position to say it. Again, I would just say that the order that we're defending, with the exception of those two paragraphs, represents the last word of the agency. Well, Mr. Jones, in the cases we had yesterday, I had another one on a different panel, same thing, but in those, they left us with the impression the wheels were turning quickly somewhere in terms of deciding exactly what the posture. I don't get the impression from you that that's necessarily the case since you're talking about the quorum and so forth. The point is . . . Yeah, Your Honor . . . The letter we got, notably to me, came from the antitrust division of DOJ, which seemed interesting to me, about the last paragraph, here's the agency, but not to absorb all your time, but it still may be that at the end of this all, we'll need something forthcoming from you or something, staking out what's what. So, as Judge Jones said, we don't spend a whole lot of time writing on something that goes away on its own or whatever. Your Honor, I can't speak . . . I wouldn't read anything into the signature from the antitrust division. They're a division that I think we worked with on the brief, so it was natural that they would sign the letter. That's fine. Go on to your argument. You know, we'll . . . Thank you, Your Honor. You're not saying that you're not . . . the agency's not in a position to change its mind at this very moment. Is that correct? Yes, Your Honor. They're not . . . they don't have the quorum to change the position right now? That's exactly right, Your Honor. The agency acts . . . the agency acted as a full commission in order to withdraw the order. The agency would, again, have to act as a full commission. Right now, we don't have a full commission and a quorum of commissioners haven't acted to withdraw the order. And that could take a very long time. I don't have any ability to estimate for the court what . . . how specific . . . any specific amount of time that that might take. Chief Judge Elrod . . . I'm sorry, but I need to ask you, why is it that you didn't tell your friends on the other side what you knew and waited to tell . . . you know, spring this on them? I assume that you were both sitting in the courtroom or out in the hall. It seems like just civility and collegiality that you would have given them a heads up that you were canceling the . . . the non-binary part of this before the argument started. That seems really . . . I understand you're under a lot of pressure and it's changing quickly, but you had information that would have been very important to them as they prepared this morning. I apologize to the court and I apologize to my friends on the other side. It did not occur to me this morning in introducing myself and talking to them to mention that to them. I recognize that perhaps I should have. I wasn't in a position to file a letter with the court between the Justice Department's filing of its letter and our . . . my getting permission and direction from my leadership about what position we were going to take today. So, things did develop rapidly, but again, I apologize to the court for any misunderstandings or omissions. Chief Judge Elrod, you asked about the Commission's statutory authority under Section 334A. And the Commission explained in the order that 330 . . . there's basically three important grounds for the Commission's statutory authority. The first is 334's direction to the Commission to collect this 395B data from television broadcasters. The Lutheran Church case and the D.C. Circuit's subsequent decision and state associations invalidated the Commission's use of the data for purposes of equal employment opportunity program enforcement. That was one of the purposes, perhaps a principal purpose of the data prior to the Lutheran Church case. But the rule doesn't solely consist of the EEO program requirements. Subsection A of that rule is titled General EEO Policy, and it contains a prohibition on discrimination by broadcasters in employment. And that requirement, that prohibition, survived Lutheran Church. The Commission in 2000, in considering the impact of the Lutheran Church case, reaffirmed the importance of the data collection for purposes independent of EEOC program enforcement. It explained that it could use the data for industry-wide statistical analysis and reporting and that that would inform its understanding of the efficacy of the nondiscrimination policy overall. The Commission at that time, in 2000, did adopt a prohibition, a strict prohibition on use of the data to consider regulatory compliance by broadcasters, either the EEO program requirements or any other FCC regulations or in connection with licensing. So under the rule, which was, again, reestablished in 2000, although the data collection had remained suspended, the order that I'm defending here today reaffirmed the prohibition on use of the data collection for other purposes, and it strengthened that prohibition. So the data collection is tied to the rule that is referred directly to in Section 334, 73-2080. And so in addition to requiring that data collection from television broadcasters, Congress, in adopting Section 334, which relies for operability on the Commission's existing regulations at the time, ratified the Commission's understanding of its own public interest authority to engage in the data collection. Thank you again. What specifically in 334A says that it can be for this purpose? Well, Your Honor, Section 334A-1 directs the Commission not to revise the regulations concerning equal employment opportunity that were in effect as of 1992. That includes subsection A of 73-2080, and that's the prohibition on discrimination. And the data collection has been tied to that prohibition since the Commission established the data collection around 1970. The Commission explained that in addition to using this information for purposes of compliance review, it would also be able to look at the data and use statistical analyses to raise questions about how effective the rules were in preventing discrimination, whether discrimination existed. So there's nothing more specific than that, and I've got 334A in front of me. Yes, Your Honor. There's no specific reference to the nondiscrimination prohibition in the Commission's rules, but again, that prohibition is contained in Section 73-2080, which the statute refers to specifically. It refers to the regulations in effect as of 1992. And again, the prohibition on employment discrimination in that rule is the same now as it was in 1992. So although the other provisions of that rule that the statute refers to specifically, tying the data collection to EEO program review are gone, subsection A remains. We pointed out in our brief that there's a severance provision in the Communications Act. And so the statute, I think, has to be read to preserve its efficacy with respect to the nondiscrimination provision. This is not about nondiscrimination, is it? Because, in fact, if people bring claims saying that these numbers show discrimination, those claims are supposed to be promptly dismissed. That's correct, Your Honor. This is not for discrimination. This is only for demographics. And so you haven't pointed to something aside from discrimination or EEO that's authorized by the statute. Your Honor, the Commission has explained since reaffirming the importance of the data collection independent of EEO program review that the data collection is tied to this discrimination prohibition. And the way that it's tied, as you say, is not for any kind of review of individual station performances or whether individual stations have discriminated, but rather to look at statistics industry-wide, the demographics of employment in the broadcast industry, and identify whether there are questions or areas of policymaking that the Commission ought to look at to determine the effectiveness overall of that discrimination prohibition. That's, I think, the justification for resuming the data collection that the Commission has given in the past, in addition to the fact that there's a statutory mandate, as the Commission understands it, to collect this data from 334A, and then also because the Commission in the past has reported to Congress on this data. Based on this data, Congress has asked for these kind of reports in the past. The last time that Congress asked, Your Honor, was 1992. It directed a report. Congress did rely on Commission reports. Most of the people in this room were not born in 1992. I understand, Your Honor, that it's been quite a long time, and it's been a long time since the Commission collected this data. The order, I think, it's not unreasonable for the Commission, which reports to Congress on all kinds of subjects within its regulatory jurisdiction, to anticipate that there might come a time in the future when Congress called upon it to provide this kind of information. How does public non-anonymous disclosure on the FCC website help with the goal of compiling employment trends and making reports to Congress? Your Honor, the order's decision to disclose this data was based upon a balancing of the potential benefits or the predicted benefits of disclosure versus the harms of disclosure. I think that federal law, there is sort of a default presumption of public availability. This data was historically available publicly. But what the Commission did was it identified certain benefits that it believed would follow from public availability, and those benefits were the reliability of the data. The Commission, the order predicted the data, if it was transparent, would be more reliable and also more useful. The Commission, in the order, explained that it can report data, it can analyze data on a greater level of granularity if the data isn't confidential. If it is confidential, it has to be sort of analyzed and reported on a more general level to avoid identifying station-specific information, which can be a problem that's acute in small areas in particular. So the Commission balanced that. Is some of that information always available in station public inspection files? That 395B data has always been included in station public inspection files. Yes, Your Honor. So why does it need to be redundantly gathered and publicly disclosed? The station files were always publicly available. 395B data historically was available in those station files. The station files have now migrated online with the passage of time, and they're hosted on the FCC's website. Those station files include all kinds of regulatory compliance materials that broadcasters are legally required to submit to the agency, applications, commercial agreements, programming lists, demographic information about ownership, and all of those are available publicly. So the Commission basically looked at the benefits. It looked at the alternatives for two-fold disclosure. One of the factors that this court identified in the Pennzoil case is relevant to an agency's decision whether to disclose data that it collects. And then finally, the Commission balanced the benefits against the harms, and the Commission, in considering the harms, pointed to this prohibition that I've mentioned in the rule provided for the data collection on the agency's use of the data for any purpose other than for this industry-wide statistical analysis and reporting. So given that prohibition that the agency has now walled off this data from any consideration of stations' performance from any possible use in an enforcement or licensing proceeding, the agency concluded that the benefits outweighed the harms. There were concerns raised in the record about outside pressure, so third parties putting public pressure on stations on the basis of this information. The Commission, in the order, explained that there was no historical record of use of the data in that way and that without the Commission's authority to use its leverage, basically, the Commission concluded that the potential for misuse of the data didn't outweigh the benefits that were identified in the order of disclosing this data publicly. There's something here in the reasoning of the FCC. The public posting would, quote, that erroneous data will be discovered and corrected, close quote, by third parties who had, quote, a connection to the station, close quote. What the heck does that mean? Is it encouraging whistleblowers in stations to say, oh, my God, we don't have 5% Asian Pacific Islanders, we have 2%? I think not, Your Honor. It's one of the reasons that the order gave for disclosing the material. Maybe not for this reason, but try to explain. Perhaps not, Your Honor, but the agency relies on the public for essentially crowdsourcing the accuracy of the data that it collects. There's a footnote we included in our brief about broadband availability. So I think that what the order had in mind was that if someone with a personal connection to the station noticed that there was a problem, that it might be able to point that out. I think it is perhaps in tension with the order's reaffirmation of the strength of this prohibition on any agency consideration for purposes of enforcement. The order promises that it will promptly dismiss any kind of filings that are based on 395B information. So I don't think that based on the language in the order, the commission would be inclined to entertain any kind of complaints about inaccurate 395B data if they were filed. There's no history in the past. Again, historically, this data was collected for over 20 years. Is there any recent history suggesting that there continues to be discrimination in the broadcasting industry covered by this order? No, Your Honor. I'm not aware of any specific information that would lead to the commission to conclude that there was discrimination in the broadcasting industry. The order and past commission orders have identified the statutory mandate along with the commission's historical interpretation of its public interest obligations to warrant this data collection. I see that my time is almost up. I'm happy to answer any questions. I have a question. Does your argument have tension with our recent en banc decision in Alliance for Fair Board Recruitment versus SEC where we held that the SEC's public interest provisions did not support board diversity disclosures? Is there tension between your argument and that en banc case? I think not, Your Honor. The public interest provisions at issue in the SEC case were very different. They appear in a very different context from the public interest provisions, and I'll explain why. I think that before we even get into that, because the commission's interpretation of its public interest provisions to grant it authority here dates back to 1970 when this data collection was established, and the commission has understood Congress to have ratified it, there would be no need for the court to engage in analysis about the context of the public interest provisions in the Communications Act. But nevertheless, the commission's understanding of its public interest authority originally was that because it's required to make a finding that the public interest would be served before granting any broadcast authorization, the commission concluded when it first established these rules, including the data collection, that it needed a prohibition on illegal discrimination by broadcasters because it couldn't make the necessary public interest finding with respect to a broadcaster that discriminated illegally in violation of national policy in the terms of its license. So that was the original reasoning. In the Alliance case, the SEC public interest provisions, those provisions appear, the court in its statutory analysis explained, at the end of a long list of provisions, all of which had to do with stock manipulation, fraud, and speculation. And so the public interest provisions were limited and defined by the preceding terms. And so they were limited to stock manipulation, fraud, and they didn't extend to diversity. And so they appear in a very different context from the Communications Act provisions. The final thing I'll just say is that that, although the court in Alliance didn't make a decision, make its decision based on the nature of the disclosure provisions, those provisions stand in stark contrast to the data collection that we have here. The rule that was struck down in that case required reporting by companies that were subject to the rule about diversity of the board. They had certain specific numerical requirements, and companies had to explain if they hadn't met those requirements. Here, what we have is purely a data collection. It's demographic data. There are no numerical targets associated with that. Okay, last question for me. Since you're not defending 39 to 40, should we do vacature of that? How does that work here? Your Honor, certainly the court has a prerogative to strike those paragraphs. I would say that those paragraphs and that decision is discrete. I don't think that it entered into the commission's reasoning with respect to the decision to disclose the data, the decision to resume the collection, or the constitutional analysis. If the court determined that the best approach was to strike those paragraphs, then that would certainly be within your prerogative. Thank you. All right. Thank you, sir. Thank you. Ms. Simon? Thank you. I want to start by addressing the public inspection file requirements, which are inviting public scrutiny. In the order the FCC tries to state that, well, these are the same public disclosure requirements we've always had, but as counsel for the FCC just noted, the public inspection file used to be housed at a local station. Somebody had to physically go there to request the data. Now it's widely available to anyone anywhere in the world, whether they're in that local community or not. And the question that your Honor asked about how is a member of the public supposed to correct a broadcaster's responses, that's exactly right. How is a member of the public supposed to know how an employee has self-identified to its employer, or if the employee refuses to self-identify how that employer has used visual observations to identify that employee? Now these broadcasters are subject to complaints not only about potentially discrimination but misrepresentation, which FCC precedent holds is one of the most serious violations a broadcaster can commit. So rightly or wrongly, they're now subject to these complaints. The FCC has stated that they'll quickly dismiss them, but how? The response times are very quick. I don't see any way practically the FCC could dismiss a complaint even if it claims it won't entertain them in enough time for a broadcaster to avoid having to hire counsel and respond and potentially face a hearing over misrepresentation either in a license proceeding or a sale proceeding, as that's been known to happen. Next I want to address the FCC's argument that 334A is tied to the nondiscrimination provision of the EEO rules. This squarely contradicts what the FCC said when it suspended the Form 395B in 2001, which was very clearly that, quote, these provisions relate to the EEO outreach program requirements. It also contradicts the FCC's 1980 EEO processing guidelines in which the FCC acknowledged that fair employment practices will not necessarily result in the hiring of a certain number of female or minority employees. So the idea that looking at the data on how many of a certain race or gender have been employed is going to elucidate anything about whether a broadcaster is discriminating is just not plausible. Moreover, there's nothing in the record, this 30-year-old-plus record, suggesting that there is a history of discrimination in the broadcast industry. At most, Congress observed that there was perhaps underrepresentation of women and minorities, but not due to any blatant discrimination. Lastly, I want to quickly address the questions that each of you have asked at the beginning, which is whether this about-face in their position has mooted the need for an order here, and we don't think that's correct. This is a proceeding that's been going on for a long time. It keeps coming back, and a decision on the statutory authority and the constitutional issues would be greatly appreciated, Your Honors. Thank you. Mr. Kelson? I just have three short points in rebuttal. First, even without the non-binary aspects of the order, it still exceeds the agency's authority. It violates the Fifth Amendment, it violates the First Amendment, and it remains arbitrary and capricious. So that concession does not change the live issues before the court. Second, the FCC relies heavily both in its briefing and today's argument on its non-discrimination provision. It tries to distinguish this from the EEO regulation to say that that part survived the D.C. Circus decision on Lutheran Church and was not held unconstitutional. But now it wants to say that the non-discrimination provision is part of the EEO rule, the EEO regulations, to invoke Section 334. The FCC can't have it both ways. And in any event, preventing discrimination is not the same thing as monitoring diversity trends. Third, the D.C. Circuit in Lutheran Church made the observation that there's a separate risk of disclosure of this information, that the risk of these disclosures lies not only in attracting the FCC's attention, but also that of third parties. The D.C. Circuit acknowledged that the public aspect of the disclosure was a separate concern that triggered Fifth Amendment scrutiny. The same thing applies in the First Amendment context as well, because the disclosure is not only the government, but these parties are being forced to make disclosures to third parties as well. In this particular case, the public disclosure also is insufficiently justified. In fact, the rationales are so weak that it shows that the decision is based on pretext and can't survive even rational basis review and is further arbitrary and capricious. Even now, the FCC seems to be backing away from some of those justifications and suggesting it would not be inclined to entertain complaints about the accuracy of that data. In the end, the parties in this case have been whiplashed for decades. This docket started in 1998. This saga should come to an end. This Court should render a decision holding, vacate and enjoin the agency order. All right, sir. Thank you. We end the case.